UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| NATIONAL LEAGUE OF ) <br> JUNIOR COTILLIONS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CHRISTY D. PORTER and ) <br> COLORADO JUNIOR COTILLION, LLC., ) <br> ) <br> Defendants. ) <br> ) | CASE NO. 3:06-cv-508-RJC |

**MEMORANDUM AND ORDER**

Presently before the Court is Plaintiff National League of Junior Cotillion's Motion for a Preliminary Injunction. (Doc. No. 25). Based on the record and the oral argument in this case, the Court will grant the plaintiff's motion with respect to Defendant Porter's alleged violation of the non-compete agreement and trademark infringement, and will grant in part and deny in part the plaintiff's motion with regard to the defendants' copyright infringement. The reasons for the Court's decision follow, beginning with the undisputed facts.

**I. BACKGROUND**

The National League of Junior Cotillions ("NLJC") began in 1979 in North Carolina. Today, the league has more than 400 chapters across the country. While originally a cotillion referred to a 19th-century dance, it has come to mean a formal gathering where, among other things, etiquette and dance are taught.

1

In April 2000, the NLJC granted Christy Porter a license to direct its then-existing chapter in Douglas County, Colorado (the "Exclusive Territory"). Porter acknowledged in the Licensing Agreement that the NLJC owned the trademarks, copyrights, and proprietary materials – e.g., the NLJC's logo; its advertisements, brochures, invitations and forms; and video cassettes and instructional material – that it provided for her use as director.[1] Porter also agreed that following termination of the Licensing Agreement she would not "use ... any of [the NLJC's] confidential information, knowledge or know-how concerning the operation, products, services, trade secrets, procedures, policies, techniques or materials or customers" acquired during her directorship,[2] nor compete against the NLJC or its licensees in the "Restricted Territory" for a period of two years.[3]

---

[1] See Licensing Agreement, p. 1: "The Licensor owns certain trademarks and service marks and certain trade names and copyrighted materials .... The Licensor is also the owner of a proprietary system and method of business operation for providing specialized instruction in a variety of social skills, etiquette and social dance and for providing related services and products in conjunction with the trademarks, trade names, service marks and copyrighted materials referred to above (the "System")."

[2] Id., Article XIV ("FURTHER OBLIGATIONS AND RIGHTS OF THE PARTIES UPON TERMINATION OR EXPIRATION").

[3] Id., Article XI ("COVENANTS NOT TO COMPETE"):
11.03  Post-Term Covenants:   Unless expressly permitted in writing by Licensor, for a period of two (2) years following the expiration or termination ... the Licensee shall not, either directly or indirectly compete with the Licensor or any other NLJC licensee by participating or engaging in any business or enterprise for the purpose of offering, selling, or otherwise providing any product or service which comprises or may in the future comprise a part of the System, or any product or service similar to the System or otherwise competitive with Licensor or any other NLJC licensee ... within any part of the Restricted Territory as is defined below.
11.04   The Restricted Territory:   The Restricted Territory, for purposes of paragraph 11.03 above, is defined as follows:

(a) the Exclusive Territory previously granted;
(b) **the twenty-five miles surrounding the boundary of the Exclusive Territory previously granted;**
(c) a territory granted to any other NLJC licensee with active NLJC or NLJC-licensed operations
(d) **the twenty-five miles radius surrounding the Exclusive Territory granted to another NLJC licensee with active NLJC or NLJC-licensed operations;**
...
(Emphases added).

2

Porter directed the Douglas County chapter until April 2006, when she notified the NLJC that she was terminating the License Agreement. Soon thereafter, Porter established the Colorado Junior Cotillion ("CJC"). Between May and August 2006, Porter wrote and prepared the CJC's curriculum, which is very similar – though not identical – to the NLJC's program (e.g., the CJC incorporates text-messaging etiquette lessons; the NLJC does not). Porter also designed the CJC's emblem (which, like that of the NLJC and other cotillion groups, consists of the CJC's initials on an embellished shield), which appeared on the CJC's advertisements, brochures, pamphlets and invitations.[4] Porter also created a website, www.coloradojuniorcotillion.com, promoting the CJC with, among other things, quotes and pictures from her former NLJC students.[5]

In June and July 2006, Porter received letters from the NLJC asserting that Porter had failed to return the NLJC's proprietary materials, and that it believed that she had violated the non-compete agreement.[6] Porter nevertheless held a "Parents' Meeting" in late July 2006 in Arapahoe County at the Glenmoor Country Club (which is located fewer than eleven miles from the Douglas County line), offered the first CJC class there in August 2006, and held more classes throughout the school year. Porter also formed a Parents Advisory Committee, 30 of the 45 members of which had filled a similar role in the NLJC's Douglas County chapter.

Since Porter resigned, the NLJC has not offered cotillion classes in Douglas County; although they allegedly have "solicited new directors for that same area, and ... hope to have one in place by the next season."[7]

---

[4] See (Complaint, Exhibits D, F, H, J and M).

[5] See (Complaint, Exhibit J).

[6] See (Defendant's Response, Exhibit 2 (Letter dated June 20, 2006, sent on behalf of the NLJC to counsel for Porter)).

[7] See (Preliminary Injunction Proceedings, Transcript at 15:9-20).

Porter's conduct led the NLJC to file a ten-count complaint in December 2006 against her and the CJC.[8] Nine of those ten counts are governed by a valid arbitration clause contained in the License Agreement and have been submitted to arbitration. Remaining is the plaintiff's request for injunctive relief.

## II. ANALYSIS

A.   Jurisdiction and Applicable Law

The Court has subject matter jurisdiction over the federal claims by virtue of 28 U.S.C. §§ 1331 and 1338(a), and finds supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). In exercising supplemental jurisdiction over the state law claims, the Court applies North Carolina substantive law, Johnson v. Hugo's Skateway, 974 F.2d 1408, 1416 n. 7 (4th Cir. 1992), although it applies the federal standards when considering the plaintiff's request for a preliminary injunction. Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991).

B.   Standard of Review

Injunctive relief "is considered an extraordinary remedy which is to be applied 'only in limited circumstances,' where, in the Court's discretion, the moving party has established that the circumstances demand it." MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir. 2001) (citations omitted). In determining whether to issue a preliminary injunction, the Fourth Circuit

---

[8]Specifically, the Complaint alleged trademark infringement (Count One), copyright infringement (Count Two), trade dress infringement; and unfair competition (Count Three), breach of contract (Count Six), conversion (Count Seven), unfair and deceptive trade practices (Count Eight), and fraud (Count Nine). The Complaint also states three claims for equitable relief: a claim for a writ of seizure of any of the plaintiff's copyrighted or trademarked materials still in the defendants' possession (Count Four), a claim for preliminary and permanent injunctions enforcing the non-compete agreement (Count Five), and a claim for a declaratory judgment of the parties' respective rights under the License Agreement (Count Ten).

applies the analytical framework described in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977) and Direx, 952 F.2d 802. First, the moving party must make a "clear showing" that it will suffer irreparable harm if the court denies its request. Direx, 952 F.2d at 812-13. Second, if the moving party establishes irreparable harm, the Court balances the likelihood of irreparable harm to the plaintiff against the failure to grant interim relief against the likelihood of harm to the defendant from the grant of such relief. Id. at 812. Third, if the balance tips decidedly in favor of the moving party, "a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus more deliberate investigation." Id. at 813. However, if balance of likely harms stands equal, the plaintiff's probability of success now assumes real significance, and interim relief shall be granted only upon a clear showing of a likelihood of success on the merits. Id. Finally, the Court must evaluate whether the public interest favors granting preliminary injunctive relief. Id.

C.  Plaintiff's Motion

The plaintiff contends that (1) because the Glenmoor Country Club is within a twenty-five mile radius of Douglas County, the defendants' activities there amount to a breach of the Licensing Agreement contract (the non-compete agreement), and therefore it asks that Porter be enjoined from competing within the Restricted Territory; and (2) the defendants' brochures, pamphlets, website, invitations and registration card infringe upon the NLJC's copyrights, and the defendants' emblem infringes upon the NLJC's trademark, and therefore the Court should enjoin the defendants from using those materials. For the following reasons, the Court finds that the plaintiff has met its burden

5

under Blackwelder with regards to its breach of contract claim and its "Parent's Reception Invitation" and emblem copyright and trademark claims only.

D.  Breach of Non-Compete Agreement

    1.  The plaintiff has demonstrated irreparable harm

To satisfy the first prong of the Blackwelder test, the plaintiff must show that the defendants conduct is likely to cause harm that is neither "remote []or speculative," but, rather "actual and imminent," Direx, 952 F.2d at 812 (citations omitted), and for which "no adequate compensatory or other corrective relief will be available at a later date," Sampson v. Murray, 415 U.S. 61, 90 (1974). The failure to do so is sufficient to deny injunctive relief. Manning v. Hunt, 119 F.3d 254, 266 (4th Cir. 1997).

Porter's alleged breach of a non-compete provision and the NLJC's resulting loss of exclusivity rights alone do not show irreparable harm.[9] Porter, however, has done more here than simply violate the non-compete clause. She has used, and continues to use, the experience, information and contacts gained from her franchise days to, essentially, convert the Douglas County Chapter of the NLJC into the Colorado Junior Cotillion (e.g., most of the parents formerly on the NLJC's advisory committee –the purpose of which is "to create interest in the families and move the program forward" – now fill similar roles with the CJC). And while the NLJC is not currently offering classes, the defendants nevertheless have deprived it of future customers and the market

---

[9] See, e.g., Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) (rejecting argument that irreparable harm automatically follows breach of covenant not-to-compete, especially in light of plaintiff's inability to show loss of goodwill or any other type of harm). This is true even though the agreement at issue contained a provision that, "any violation of the covenant not to compete will result in immediate and irreparable injury to [the NLJC] ...." (Licensing Agreement, Article 11.06). While the Court gives weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, these statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief. See, e.g., Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1259 (10th Cir. 2004).

goodwill it had established prior to, and over the course of, the franchise relationship with Porter, making it difficult for the NLJC to re-establish an authorized chapter in the area. These are injuries that are irreparable and incalculable. See Duct-O-Wire Co. v. U.S. Crane, Inc., 31 F.3d 506, 509-10 (7th Cir. 1994) (stating that the "irreparable harm is that [franchisor] will lose sales and the opportunity to maintain and develop relationships with existing and potential customers"); Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) ("Irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.") (citation omitted).

        2.        The balance of harms stands equal

"A district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken." Scotts Co. v. United Industries Corp., 315 F.3d 264, 285 (4th Cir. 2000) (quoting American Hosp. Supply Corp. v. Hospital Prods. Ltd., 780 F.2d 589, 593 (7th Cir. 1986) (internal quotations omitted)). Thus, while cases frequently refer to the harm to the plaintiff if the injunction is denied and the harm to the defendant if the injunction is granted, the real issue is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is improperly denied or granted. Id.

Here, Porter argues that if the Court issues a preliminary injunction preventing her from running the CJC, she effectively would be put out of business until the expiration of the non-compete clause, and would therefore "face a severe hardship."[10] To be sure, Porter could have avoided this possibility. For example, upon first learning in June 2006 that the NLJC thought that her actions

---

[10] See Porter Affidavit at ¶¶ 1(e), 13.

7

breached the non-compete agreement,[11] Porter could have sought clarification, e.g., through an action for declaratory judgment, as to the legality of operating the CJC in its current location. By the same token, however, the NLJC delayed six months in filing suit, and another three months before moving for injunctive relief, after it first believed Porter violated the non-compete agreement. Thus, the Court finds that the balance of the likely harms stands relatively equal. The plaintiff must therefore show a strong probability of success on the merits of its claim before an injunction is issued.

    3.  The plaintiff has demonstrated a strong likelihood of success on the merits

In North Carolina, a covenant not-to-compete is valid and enforceable if it is (1) in writing, (2) based upon valuable consideration, (3) reasonably necessary for the protection of legitimate business interests, (4) reasonable as to time and territory, and (5) not otherwise against public policy. Kennedy v. Kennedy, 584 S.E.2d 328, 333 (N.C. App. 2003) (citing A.E.P. Industries, Inc. v. McClure, 302 S.E.2d 754 (N.C. 1983)). Covenants not-to-compete restrain trade, and therefore are strictly scrutinized. United Laboratories, Inc. v. Kuykendall, 370 S.E.2d 375, 382-283 (N.C. 1988).

Here, the defendants do not dispute that the covenant not-to-compete is valid. Rather, they contend that the language "the twenty-five miles surrounding the boundary of the Exclusive Territory previously granted" is ambiguous because it may be interpreted in three separate and distinct ways: (1) the twenty-five square miles surrounding Douglas County, Colorado area;[12] (2) the area contained within a radius of twenty-five miles from each boundary point of Douglas County, Colorado;[13] and

---

[11] See Letter dated June 20, 2006, from the plaintiff's counsel to alleging that Porter had failed to return certain materials, and "has violated Article XI of the Agreement, entitled, "Covenants Not to Compete" and if "Porter" continues to violate the Agreement, NLJC will have no alternative but "to obtain injunctive relief .... and will be forced to bring litigation against her in order to protect its interest and rights."

[12] See Defendants' Motion to Take Judicial Notice, Exhibit 3 (a map showing both Douglas County and a surrounding twenty-five square mile "buffer zone"). The resulting Restrict Area would be only marginally larger than Douglas County itself (i.e., the area within a radius of 1,004 feet from each county boundary point).

[13] See Defendants' Motion to Take Judicial Notice, Exhibit 4 (a map showing both Douglas County and a surrounding twenty-five mile radius "buffer zone"). The resulting Restricteded Area would cover nearly 5,000 square miles.

(3) any area encompassing twenty-five square miles which surrounds Douglas County, Colorado. The defendants admit that the first and third proposed interpretations would require adding the term "square" to the literal language of 11.04 (b). The defendants also seem to acknowledge that the area of the third proposed interpretation "could be drawn in innumerable ways" and that adding the term "square" to the literal language of the third interpretation would be to render the term "Restricted Territory" extremely difficult, if not impossible to calculate.

The Court finds the defendants' argument unpersuasive as it ignores two basic principles of contract construction. First, a contract must be construed as a whole, "considering each word clause and word with reference to other provisions." State v. Corl, 293 S.E.2d 264, 267 (N.C. App. 1982). Second words in a contract will be given their common or normal meaning unless circumstances show a special meaning should be attached to them. Marcoin, Inc. v. McDaniel, 320 S.E.2d 892, 897 (N.C. App. 1984) (citing Jamestown Mut. Ins. Co. v. Nationawide Mut. Ins. Co., 146 S.E.2d 410 (N.C. 1966).

Construed as a whole, Article XI, ¶ 11.04 (b) must be interpreted in light of Article XI, ¶ 11.04 (d), which provides "the twenty-five mile *radius* surrounding the Exclusive Territory granted to any NLJC licensee with active NLJC or NLJC-licensed operations." (emphasis added). With reference to this provision, it is clear that the "twenty-five miles surrounding the Exclusive Territory" refers to the area contained within a radius of twenty-five miles from each boundary point of Douglas County, Colorado. This interpretation is furthered by the second principle of contract construction. Applying the common or normal meaning of the word mile, it is clear that "mile" refers to a measure of distance or a unit of length.

In response, the defendants have provided no reason for the Court to believe that, when guided by traditional principles, the construction as set forth in first and third proposed definitions is more reflective of the parties' intent than the more reasonable construction as set forth in the defendants' second construction of 11.04(b). With the determination that the non-compete clause clearly provides a geographic restriction within a 25-mile radius of the borders of Douglas County, Porter clearly breached the contract when she held the CJC's programs at the Glenmoor Country Club, fewer than eleven driving miles from the county line.

4. The public interest favors an injunction

While the law frowns upon unreasonable restrictions, it favors the enforcement of contracts intended to protect legitimate interests. "It is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." Sonontone Corp. v. Baldwin, 42 S.E.2d 352, 355 (N.C. 1947). There is nothing in the record to indicate that the non-compete agreement is unreasonable or that the public interest would be in some other way damaged by Porter's absence from the Restricted Territory. The NLJC, however, lose the benefit of its bargain in the non-compete agreement if it were not enforced. As such, the public interest favors an injunction.

E. Copyright Claims and Trademark Claims

There is some question over the applicable burden of proof associated with preliminary injunctions in copyright and trademark infringement law suits. Certainly, the parties agree that once the plaintiff establishes a prima facie claim of copyright or trademark infringement, the Court is entitled to presume a likelihood of success on the merits and irreparable harm. See In re Microsoft Corporation Antitrust Litigation, 333 F.3d 517, 536 (4th Cir. 2003). The Supreme Court, however,

recently disapproved the use of categorical rules in connection with permanent injunctive relief in patent actions. eBay Inc. v. MercExchange, LLC, --- U.S. ----, 126 S.Ct. 1837, 1840 (2006) (reversing the Federal Circuit, that had articulated "a 'general rule,' unique to patent disputes, 'that a permanent injunction will issue once infringement and validity have been adjudged.' "). The Fourth Circuit more recently reaffirmed the traditional showing that a plaintiff must make to obtain a permanent injunction in copyright cases. Christopher Phelps & Associates, LLC v. Galloway, --- F.3d ----, 2007 WL 1933594, at *9 (4th Cir. July 5, 2007) (citing eBay).

Some have suggested that eBay (and Phillips by extension) forecloses the use of a presumption of irreparable harm on applications for preliminary injunctions in IP cases.[14] Both decisions, however, came after a full trial and on an application for a permanent injunction, and by their terms, both apply only to permanent injunctions.[15] Moreover, the only Court of Appeals opinion to explicitly address the decision suggests that, at the preliminary injunction stage, the

---

[14]While the complete contours of eBay have yet to be developed, it has been applied to preliminary injunctions predominately in patent cases. See Torspo Hockey Int'l., Inc. v. Kor Hockey Ltd., No. 07-246, 2007 WL 1752725, at *8 (D. Minn. June 18, 2007); The Chamberlain Group, Inc. v. Lear Corp., et al., No. 05-3449, 2007 WL 1017751, at *7 (N.D. Ill. Mar. 30, 2007); Erico Int'l Corp. v. Doc's Marketing, Inc., 2007 WL 108450, *7 (N.D. Ohio. Jan. 9, 2007); Smith & Nephew, Inc. v. Synthes (U.S.A.), 466 F. Supp. 2d 978, 982 (W.D. Tenn. 2006); Canon, Inc. v. GCC Int'l Ltd., 450 F. Supp.2d 243, 254 (S.D.N.Y. 2006). eBay's reasoning also has been applied to preliminary injunctions in copyright cases (see Allora, LLC v. Brownstone, Inc., No. 07-87, 2007 WL 1246448, at *5 (W.D.N.C. April 27, 2007) (applying eBay to copyright claims)) and trademark infringement claims (see Harris Research, Inc. v. Lydon, No. 06-136, 2007 WL 1052479 (D. Utah Apr. 5, 2007); MyGym, LLC v. Engle, 2006 WL 3524474, at *11 (D. Utah Dec. 6, 2006) (citing eBay as a "see also" in trademark infringement claim); cf. Lorillard Tobacco Co. v. Engida, No. 06-1115, 2007 WL 39207, at *2-3 (10th Cir. Jan. 8, 2007) (citing eBay, but holding that a preliminary injunction was unwarranted even under pre-eBay standards)).
 The idea that eBay applies at the preliminary injunction stage has not been unanimous, however. See Christiana Indus. v. Empire Electronic, Inc., 443 F. Supp. 2d 870, 884 (E.D. Mich. 2006), vacated on other grounds, 2006 WL 2375956 (E.D. Mich. Aug. 16, 2006); PHG Techs. v. Timemed Labeling Sys., 2006 U.S. Dist. LEXIS 66828, at *65 (M.D. Tenn. Sep. 18, 2006) ("having established the first factor of likelihood of success on the merits PHG is entitled to a rebuttable presumption of irreparable harm"); Sanofi-Synthelabo v. Apotex, Inc., 2006 U.S. Dist. LEXIS 65127, *17 (S.D.N.Y. Aug. 31, 2006) ("if the moving party 'clearly establishes the first factor, it is entitled to a rebuttable presumption' of irreparable harm").

[15]See United States Dept. of Labor v. Wolf Run Mining Co., Inc., 452 F.3d 275, 280 (4th Cir. 2006) ("Unlike a permanent injunction, which resolves the merits of a claim and imposes an equitable remedy because a legal one is inadequate ... a preliminary injunction maintains a particular relationship between the parties in anticipation of a decision on the merits, pending completion of the litigation." (citation omitted)).

11

presumption based on likelihood of success survives eBay. See Abbott Laboratories v. Andrx Pharmaceuticals, Inc., 452 F.3d 1331, 1347 (Fed. Cir. 2006) ("Abbott has not established a likelihood of success. As a result, Abbott is no longer entitled to a presumption of irreparable harm.").

Because neither the Supreme Court nor the Fourth Circuit has explicitly extended eBay's reasoning to preliminary injunctions, and given the slight record in this case, the Court will not attempt to resolve eBay's impact at the preliminary injunction stage, and will proceed with the analysis detailed in Microsoft and elsewhere. However, while the Court here cites the presumption, it does not rest any conclusion that the plaintiff has suffered irreparable harm solely on the presumption.

### 1. The plaintiff has demonstrated a prima facie claim of copyright infringement as to some of the allegedly infringing materials

A plaintiff can establish a prima facie claim by showing ownership of a valid copyright and that the defendant copied the original elements of that copyright. Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 801 (4th Cir. 2001) (citations omitted). Here, the parties do not dispute that the NLJC's materials are subject to a valid copyright.[16]

Although the plaintiff possesses no direct evidence the defendants copied its protected work (except for the back of the registration card, which Porter admits copying), circumstantial evidence may support a presumption of copying if (1) the defendants had access to the plaintiff's work and (2) there is a substantial similarity between the alleged copy and the protectable elements of the original. See Towler v. Sayles, 76 F.3d 579, 581-82 (4th Cir. 1996). Here, Porter clearly had access to the NLJC's materials.

---

[16] See (Complaint, Ex. 4-14).

In addressing whether the works at issue are "substantially similar," the Court evaluates whether the works are extrinsically similar and intrinsically similar. See Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 801 (4th Cir. 2001). Extrinsic similarity in this case focuses on the similarity between the objective elements, such as artwork, layout, text, font, photographs, theme, subject and the means used to describe the subject. Intrinsic similarity focuses on whether the "total concept and feel of the disputed works," as seen through the eyes of the ordinary observer who a member of the intended audience of the work, resembles that of the plaintiff. Lyons, 243 F.3d at 801 (citing Dawson v. Hinshaw Music, Inc., 905 F.2d 731, 733 (4th Cir. 1990)). Judge Learned Hand described the test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960).

In addressing this second prong, the Court separates the protectable expression unique to the allegedly infringed work from the unprotectable expression that is dictated by the idea upon which the work is based. Aliotti v. R. Dakin & Co., 831 F.2d 898, 901 (9th Cir. 1987). The Court then looks to the entire work, including the unprotectable expression, to determine if the two works are substantially similar. In analyzing substantial similarity, the Court is "guided by the proposition that the sine qua non of copyright is originality." Comins v. Discovery Communications, Inc., 200 F. Supp. 2d 512, 518 (D. Md. 2002) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991)). The Court therefore, will not find substantial similarity "where analytical dissection demonstrates that all similarities in expression arise from the use of common ideas" because protecting the expression when the idea and expression are inseparable "would confer a monopoly of the idea upon the copyright owner." Herbert Rosenthal Jewelry Corp. v. Kalpakian, 446 F.2d 738,

13

742 (9th Cir. 1971); see also 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery.").

    (a)  The defendants' brochures and website do not infringe[17]

The plaintiff has offered little comparison of the elements of the plaintiff's works and the works of the defendants other than its side-by-side presentation of the documents. The defendants, however, have throughly limned the differences between plaintiff's and defendants materials.[18] Even if the Court were to find the brochures limited commonalities were sufficient under the extrinsic test (because the brochures and websites serve the general function through the same general means and relate to the same subject), based on its side-by-side comparison of all the materials, the Court finds as a matter of law that the only observable similarities concern unprotectable elements and the dissimilarities so far outnumber the *de minimus* points of similarity that the relevant audience would overlook any similarity and would not "regard their aesthetic appeal as the same."

    (b)  The defendants captured the "total concept and feel" of plaintiff's Parents' Reception Invitation.[19]

The similarities between defendants' design and plaintiff's design are easily recognizable to the reasonable observer. Both appear to be printed on white panel cards. The defendants' invitation uses nearly verbatim language as the plaintiff's. The line formatting and the placement of the logo are identical. While there are some differences between the plaintiff's designs and defendants' designs (e.g., the font in each invitation is different), an accused work need not be

---

[17] See (Complaint, Ex. C, K, L ) (the NLJC's brochures) and (Complaint, Ex. D, M ) (the CJC's brochures); and (Complaint, Ex. I) (the NLJC's website, www.nljc.com, as of July, 31, 2006) and (Complaint, Ex. J) (the CJC's website, www.coloradojuniorcotillion.com, as of September 19, 2006 ).

[18] See (Porter Affidavit, ¶¶ 8, 11-12)

[19] See (Complaint, Ex. E) (the NLJC's invitation) and (Complaint, Ex. F) (the CJC's invitation).

14

exactly identical to infringe. To the contrary, the existence of differences will not negate infringement unless they so outweigh similarities that the similarities can only be deemed inconsequential within the total context of plaintiff's work.[20] Here, the minor differences in this case are ones that, in Judge Hand's words, the ordinary observer would be "disposed to overlook."

        (c)       The defendants' registration card does not infringe the plaintiff's copyright[21]

Although Porter has admitted that she copied the back of the registration card, in this case it does not mean the plaintiff has proved its prima facie case.

Unlike the invitations, the plaintiff's registration form, especially the back, is predominantly, if not completely, made up of unprotected statements. See Baker v. Selden, 101 U.S. 99 (1879) ("Blank forms, such as ... order forms and the like ... which are designed for recording information and do not in themselves convey information"); Publ'ns Int'l, Ltd. v. Meredith Corp., 88 F.3d 473, 480 (7th Cir. 1996) ("The recipes contain no expressive elaboration upon ... these functional components, as opposed to recipes that might spice up functional directives by weaving in creative narrative."); Morrissey v. Procter & Gamble Co., 379 F.2d 675 (1st Cir. 1967) (basic set of rules for a promotional sweepstakes is not copyrightable).

Even when viewed as a whole, the Registration Form remains purely functional. The NLJC's decisions to include or how to display certain information is hardly a creative choice; such biographical information is standard in registration forms and there are limited number ways available to display the relevant information. For purposes of this preliminary injunction, the Court

---

[20] In fact, the appearance of minor differences only emphasizes the extent to which the defendants deliberately copied from the plaintiff. See, e.g., Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 65 (1st Cir. 2000); Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp., 672 F.2d 607, 618 (7th Cir. 1982); Concord Fabrics, Inc. v. Marcus Bros. Textile Corp., 409 F.2d 1315, 1316 (2d Cir. 1969).

[21] See (Complaint, Exhibit G) (the NLJC's registration card) and (Complaint, Exhibit H) (the CJC's registration card).

finds that the plaintiff has offered nothing to suggest that even minimal protection could possibly be claimed in the way the information is conveyed, or the arrangement and coordination of the form itself, such that there is near identity between the registration forms.

    2.       The plaintiff has made a prima facie case of trademark infringement

To succeed on a Lanham Act cause of action for trademark infringement, a plaintiff must show that (1) its mark is protectable and that (2) the use of the junior mark is likely to confuse the public. 15 U.S.C. § 1114(1)(a). "[I]t is not necessary for the owner of the registered trademark to show actual confusion: the test is whether there is likelihood of confusion." Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1527 (4th Cir. 1984). If the use of the contested mark is likely to cause such confusion, the owner of the registered trademark is entitled to relief. Id. The factors to be considered in determining likelihood of confusion are: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) the defendant's intent; and (7) actual confusion. Id. at 1527. This is a non-exhaustive list. See Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 463-64 (4th Cir. 1996) (considering also the quality of the defendant's product and the sophistication of the consuming public). The Court applies these factors generally, with the understanding that not every factor is necessarily relevant or equally emphasized in each case. Cf. Perini Corp. v. Perini Constr. Inc., 915 F.2d 121, 127 (4th Cir. 1990) (holding that no one factor is dispositive on the determination of likelihood of confusion). Applying the controlling test to the facts shows that the plaintiff has established that CJC's use of its logo is likely to confuse the ordinary consumer as to the source or sponsorship of goods.

First, the plaintiff's mark is strong. The strength of a mark depends on two factors: the inherent distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class. See Petro Stopping Centers, L.P. v. James River Petroleum, Inc., 130 F.3d 88, 93 (4th Cir. 1997). Here, although the NLJC's emblem does not possess great inherent distinctiveness – other groups use embellished crests and use "cotillion" to describe their business[22] – it has acquired local and nationwide recognition due to its prominent use and the plaintiff's advertising and publicity efforts.

Second, the Court finds that the marks are sufficiently similar such that the overall impression conveyed by the marks is likely to result in consumer confusion. See Luigiano's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999) ("[The Court will] consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar."). Given that the services are identical, the similarities are heightened.[23]

To be sure, as the defendants point out, there are differences between the two emblems.[24] "Absolute identity [however,] is not required for a finding of likelihood of confusion; all that is necessary is enough similarity between the marks to confuse consumers." Washington Speakers Bureau, Inc. v. Leading Auths., Inc., 33 F. Supp. 2d 488, 497 (E.D. Va. 1999). In fact, as the public is unlikely to encounter the marks together, it would be "inappropriate to focus on minor stylistic

---

[22] See (Porter Affidavit, ¶¶ 5-6).

[23] See Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 877 (Fed. Cir. 1992) ("When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines.") (citations omitted); Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1190-1191 (6th Cir. 1988) (where "marks use identical language to sell a nearly identical service, the likelihood of confusion must be considered great.").

[24] See (Porter Affidavit, ¶ 4).

17

differences in determining the likelihood of confusion caused by the defendants' use of the allegedly infringing mark, especially since consumers do not have the opportunity to view the marks side-by-side. See Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1088 (7th Cir. 1988) (citing Sun-Fun Prods., Inc. v. Suntan Research & Dev., Inc., 656 F.2d 186 (5th Cir. 1981) ("the inability to compare the [marks] side-by-side and observe the precise difference in appearance may increase the likelihood of confusion.")). Thus, the Court has avoided putting too much stock in a subjective inspection done in-chambers that is devoid of market characteristics, and instead it has attempted to recreate the conditions in which buying decisions are made, and what a reasonable purchaser in market conditions would do. Calvin Klein Cosmetics Corp. v. Lenox Labs., 815 F.2d 500, 504 (8th Cir. 1987).[25]

Third, the proximity of the businesses and the similarity of the advertising used by the two parties weights in favor of the plaintiff. Here, the close geographic proximity of the NLJC and the CJC, the nearly identical nature of the services and class of customers, the fact that Porter once directed the NLJC branch, and the significant overlap in the methods advertising the products[26] would easily lead a reasonable buyer to assume that the CJC is sponsored by the NLJC.

These findings outweigh the absence of evidence in the record of either of actual confusion, or a proven predatory attempt on the behalf of the defendants to lead potential customers to believe that its and the NLJC's services were one in the same.

---

[25] See also Wynn Oil Co., 839 F.2d at 1187 (holding "side-by-side" comparison is not the test to determine similarity) (quoting Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir.1980)); James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976)

[26] Pizzeria Uno, 747 F.2d at 1527. If so, the likelihood of confusion is increased. If not, the risk of confusion is diminished.

18

3. The plaintiff has demonstrated a likelihood of irreparable harm and that the harms balance in its favor.

The Court finds that the plaintiff has met its burden of showing irreparable injury – with regard to the NLJC's Parents' Reception invitation and the NLJC's logo (but not the brochures, the website, and the reception card) – by showing both a likelihood of confusion, and that its copyrighted and trademarked materials are being diluted and that the reputation of its mark is being harmed. In particular, the NLJC has expended substantial amounts of time, money, and resources in establishing the reputation and quality of its trademark and copyrighted materials. In particular, its trademark is recognized nationwide and represents goodwill acquired over years of continuous use. In light of the foregoing, the defendants' use of the copyright and trademark creates a substantial risk of irreparable harm. Conversely, there is little evidence of any damages that the defendants might suffer if enjoined from continuing to use the allegedly infringing material mark. Thus, the Court finds that the threatened injury to the plaintiff outweighs the harm caused to defendants as a result of the injunction.[27]

4. The public interest favors the injunction

While the public has interest in preventing the misappropriation of the skills, creative energies, and resources that are invested in the protected work, it is also true that there is a strong public interest in free competition where legal rights are not invaded. Hence, the public interest at issue in this case is closely tied to the likelihood of success of the plaintiff on the merits. As the plaintiff has shown a clear likelihood of success on certain claims, it shown that the public interest favors the grant of a preliminary injunction herein.

---

[27] This is true even if the defendants were not enjoined from competing in the "Restricted Area."

# III. CONCLUSION

Therefore, for the foregoing reasons, it is **HEREBY ORDERED** that Plaintiff NLJC's Motion for Preliminary Injunction (Doc. No. 25) be **GRANTED IN PART AND DENIED IN PART** as follows:

1. Defendant Christy Porter is **ENJOINED** from competing within the "Restricted Area," i.e., the area within a twenty-five mile radius of Douglas County (See Defendants' Motion to Take Judicial Notice, Exhibit 3) for the term provided for in the Licensing Agreement;

2. Defendants are **ENJOINED** from using the Parents' Reception Invitation (See Complaint, Ex. F) for the duration of this action; and

3. Defendants are **ENJOINED** from using the CJC's Emblem for the duration of this action.

Signed: August 9, 2007

Robert J. Conrad, Jr.
Chief United States District Judge